# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ECHO TUESDAY BURGETT, | ) | CASE NO. 1:18CV444 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Echo Tuesday Burgett, ("Plaintiff" or "Burgett"), challenges the final decision of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

# I.  PROCEDURAL HISTORY

In July 2014, Burgett filed an application for POD and DIB, alleging a disability onset date of October 28, 2013 and claiming she was disabled due to a back injury and depression. (Transcript ("Tr.") 19, 91, 199.)  The applications were denied initially and upon reconsideration, and Burgett requested a hearing before an administrative law judge ("ALJ").  (Tr. 19, 114-121.)

On December 13, 2016, an ALJ held a hearing, during which Burgett, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 37-69.)  On February 14, 2017, the ALJ issued a written decision finding Burgett was not disabled.  (Tr. 19-36.)  The ALJ's decision became final on December 28, 2017, when the Appeals Council declined further review. (Tr. 1-6.)

On February 24, 2018, Burgett filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 12, 13, 14.) Burgett asserts the following assignments of error:

(1)     The ALJ violated the Treating Source Rule by failing to provide good reasons for rejecting the treating source opinions of record.  Thus, the ALJ's residual functional capacity decision cannot be deemed supported by substantial evidence.

(2)     The ALJ's decision is not supported by substantial evidence because his residual functional capacity determination is inconsistent with the opinion evidence of record.  The ALJ rejected every set of opinions within the record and instead erroneously relied on his own medical expertise

(Doc. No. 12.)

# II.  EVIDENCE

## A.     Personal and Vocational Evidence

Burgett was born in February 1970 and was forty-six (46) years-old at the time of her

administrative hearing, making her a "younger" person under social security regulations.  (Tr. 29.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 29.)  She has past relevant work as a vocational training teacher.  (Tr. 28.)

**B.      Relevant Medical Evidence[2]**

The record reflects Burgett suffered a back injury at work in 2004 and subsequently underwent back surgery in July 2007 after conservative treatment methods failed to alleviate her pain.  (Tr. 211, 529-531, 526.)  Burgett reported that she was unable to work from July 2004 until February 2008.  (Tr. 211.)

On June 28, 2013, Burgett presented to pain management physician James Wolfe, M.D., for evaluation of radiating back pain.  (Tr. 539.)  She reported two episodes during the previous month "where her right leg gave out on her."  (*Id*.)  Examination revealed mildly tender back, negative straight leg raise, and good motor and sensory function in Burgett's legs.  (*Id*.)  Dr. Wolfe renewed her pain medications.  (*Id*.)

On August 2, 2013, Burgett complained of worsening pain radiating down her right leg.  (Tr. 540.)  Examination revealed back tenderness, positive straight leg raise, and grossly intact neurologic function in both legs.  (*Id*.)  Dr. Wolfe ordered an MRI of Burgett's lumbar spine,

_____

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  The Court feels compelled to note that Burgett failed to comply with the Court's Initial Order.  Specifically, the Court's Order requires that "**citations to the Transcript should refer to the page number indicated on the lower right hand corner of the document, and NOT to the PageID# at the top of the document**."  (Doc. No. 5 at 3) (bold in original).  Despite this clear directive, Burgett cites only to the PageID# and not the page number on the lower right hand corner of the Transcript.  Counsel for Burgett is cautioned that he must comply with this Court's Orders in all future filings.

which she underwent on August 9, 2013.  (Tr. 540, 516-517.)  This MRI revealed the following: (1) degenerative disc disease with circumferential annular bulging at L4-L5 with a mild degree of stenosis; and (2) degenerative disc disease with interspace narrowing and posterior displacement of the right S1 nerve root with moderate to severe foraminal stenosis.  (Tr. 516-517.)

On August 23, 2013, Dr. Wolfe found Burgett was "reasonably stable."  (Tr. 541.) Examination revealed back tenderness and positive straight leg raise.  (*Id*.)  Dr. Wolfe referred Burgett to a neurosurgeon.  (*Id*.)  Shortly thereafter, Burgett returned to Kelly J. Kiehm, M.D., who performed her 2007 back surgery.  (Tr. 521-522.)  She complained of low back pain, as well as right-sided leg pain, numbness and tingling, that worsened with driving, prolonged sitting, and squatting.  (*Id*.)  Dr. Kiehm noted Burgett had good strength in her lower extremities and myofascial tenderness on her right side.  (*Id*.)  He assessed lumbar herniated disc at L5-S1 and recommended surgery; i.e., a right-sided redo discectomy.  (*Id*.)

Burgett underwent back surgery on October 28, 2013.  (Tr. 351-352.)  On November 7, 2013, she was approved for a wheeled walker and a tub seat with back.  (Tr. 543-546.)  Later that month, Burgett complained of continuing right-sided leg and low back pain.  (Tr. 523-524.)  A physician assistant from Dr. Wolfe's office, Jenna Little, PA-C, found "global right-sided weakness" and pain on examination.  (*Id*.)  Ms. Little increased Burgett's Neurontin, and prescribed Percocet and a Medrol Dose-Pak.  (*Id*.)

On January 3, 2014, Burgett reported "she has not really improved."  (Tr. 421-422.)  She stated her right leg was "still bothering her a lot," and complained of a "burning sensation" in her leg as well as one episode when her leg "gave out on her."  (*Id*.)  Ms. Little indicated that "[a]t this time, [Burgett] does not feel like she can go back to work and I do not think she can either."

4

(*Id*.)  She ordered an injection, prescribed physical therapy, and wrote Burgett off work until March 2014.  (*Id*.)

Burgett underwent a nerve block injection on February 17, 2014.  (Tr. 417.)  She began physical therapy several days later, on February 21, 2014.  (Tr. 407-411.)  Burgett complained of right leg weakness, numbness, tingling, and pain, and stated she was "limited in how long she can do one thing – whether it is sitting, standing, laying, etc." (Tr. 407.)  She reported a sitting tolerance of 20 to 30 minutes, standing tolerance of 5 minutes, and walking tolerance of 30 minutes.  (*Id*.)  Burgett also indicated she had had three near falls and one actual fall since her October 2013 surgery.  (*Id*.)  Examination revealed reduced lower extremity strength; diminished sensation to light touch in her right lower extremity; tenderness to palpation in her lumbar spine, pelvic region, and right lower extremity; and antalgic gait.  (Tr. 409-410.)  The physical therapist recommended aquatic therapy with eventual transition to land therapy.  (Tr. 411.)  The record reflects Burgett attended multiple physical therapy sessions in February and March 2014.  (Tr. 404-406, 394-397, 398-400, 383-388, 389-392, 364-369, 377-382, 359-363, 370-376.)

On March 4, 2014, Burgett returned to Dr. Kiehm.  (Tr. 402.)  He noted Burgett was "still quite miserable."  (*Id*.)  Dr. Kiehm increased her Neurontin, advised to finish her physical therapy, and wrote her off work for another six weeks.  (*Id*.)

On March 5, 2014, Burgett presented to psychiatrist Rashid Pervez, M.D., for evaluation of depression.  (Tr. 506-507.)  She complained of decreased energy and motivation, difficulty concentrating, fatigue, and sleep disturbance.  (*Id*.)  With regard to her back pain, Burgett indicated she "was not doing well with the pain" and did not think she was healing, but wanted to work once she improved.  (*Id*.)  On examination, Dr. Pervez noted Burgett was "sad looking" and

5

tearful with normal speech, normal thought content, no suicidal ideation, intact cognitive functioning, intact short and long term memory, and fair insight.  (*Id*.)  He diagnosed major depressive disorder, single episode, moderate; and prescribed Cymbalta.  (*Id*.)

Burgett returned to Dr. Wolfe on March 7, 2014.  (Tr. 403.)  She was "doing a little bit better" since her injection.  (*Id*.)  Examination revealed back tenderness and borderline straight leg raise on the right.  (*Id*.)  Dr. Wolfe adjusted her dose of Gabapentin "yet again," and recommended another injection.  (*Id.*)

On April 7, 2014, Burgett reported to Dr. Pervez that she was "doing fine" and felt that "she can handle things better."  (Tr. 508.)  Mental status examination findings were normal.  (*Id*.)  Dr. Pervez also noted Burgett's "muscle strength, muscle tone, gait and station are all normal."  (*Id*.)  He continued her on Cymbalta.  (*Id*.)

Several days later, Burgett returned to Dr. Wolfe and reported she was "quite a bit better" and "may be going back to work within the next two weeks."  (Tr. 514.)  Examination revealed mildly tender back, "equivocal" straight leg raise, and "reasonably intact" neurological function in the legs "except for some breakaway weakness." (*Id*.)  Dr. Wolfe recommended another injection.  (*Id*.)

On April 15, 2014, Dr. Kiehm noted therapy "actually helped" Burgett, noting she reported "she is stronger in her back and when [she] lays down her pain actually improves."  (Tr. 547.)  Burgett also indicated "she would like to try to go back to work" and Dr. Kiehm agreed it was "reasonable" for her to try three days a week full time.  (*Id*.)  Dr. Kiehm also ordered another round of physical therapy.  (*Id*.)

On May 6, 2014, Burgett reported that "3 days a week is pretty difficult."  (Tr. 548-549.)

She explained that "when she works 3 straight days she is quite miserable and cannot do anything the remaining days of the week." (*Id.*)  Burgett complained of continuing back and right sided leg pain, as well as right leg numbness, tingling, and weakness.  (*Id.*)  Dr. Kiehm ordered an MRI, prescribed a TENS unit trial, and recommended that Burgett continue physical therapy. (*Id.*)

Burgett underwent an MRI of her lumbar spine on June 3, 2014.  (Tr. 556-557.)  It revealed as follows:

> 1. L5-S1 right laminectomy.  Broad-based disc protrusion with superimposed HNP right foraminal and extraforaminal.  The HNP measures 12 mm in AP dimension and moderately narrows the right foramen and abuts the right L5 nerve root.  Milder left foraminal narrowing is also noted with the protruding disc abutting the left L5 nerve root. * * *
>
> 2. L4-L5 concentric bulging disc.  Facet arthropathy.  Mild left greater than right foraminal stenosis is noted. The bulging disc abuts the descending left L5 nerve root with mild displacement of this nerve root. Abutment of the right L5 nerve root is also noted.

(Tr. 557.)

On June 5, 2014, Burgett returned to Dr. Pervez.  (Tr. 509.)  She indicated her mood had improved and noted she was "going to have another surgery."  (*Id.*)  Mental status examination findings were normal.  (*Id.*)  Dr. Pervez also noted Burgett's "muscle strength, muscle tone, gait and station are all normal." (*Id.*)

Several days later, on June 10, 2014, Burgett returned to Dr. Kiehm.  (Tr. 550-551.)  Dr. Kiehm noted as follows:

> At this point she is quite miserable.  She cannot sit or stand or do any kind of activity for a long period of time.  When she sits for more than 15 minutes her foot goes numb.  The only way she gets some relief is if she lies down.  When she is at home, on break or on vacation she is able to lie down and she does okay.  The pain is still about 6/10. When she stays in zero gravity chair and lays

7

down she does okay.

At this point I gave a couple of options. She can consider a spinal cord stimulator or she can consider surgery. She can also consider what she is doing. She had a hard time deciding what to do. She definitely did not want to do the spinal cord stimulator right off because she did not like how the TENS unit made her feel. If she were to have surgery I told her she would probably need a fusion and she was thinking about that. I told her she may have a chance of getting her leg pain to get better but was not sure if it would help her back. She understood that as well.

At this point I do not think she can work because being upright gives her a fair amount of pain. Her leg also gives out so she is a danger to herself. We will take her off work for 2 months.

(*Id*.)

On June 13, 2014, Burgett presented to Dr. Wolfe. (Tr. 512.) He noted she was "just struggling emotionally and she's still having some radicular symptoms if she tries to drive too long or be too active." (*Id*.) Examination revealed tenderness and borderline right straight leg raise. (*Id*.) The following month, Burgett asked Dr. Kiehm if she could use a cane. (Tr. 552.) He felt "it would benefit her to get a cane," and noted she was going to purchase one over the counter. (*Id*.) In August 2014, Burgett was "still quite miserable" and using a cane to walk for long periods of time, especially on uneven surfaces. (Tr. 554.) Dr. Kiehm found she had failed conservative care and recommended another surgery. (*Id*.) He ordered her off work for another three months. (*Id*.)

On August 15, 2014, Dr. Wolfe again noted Burgett was "clearly struggling." (Tr. 511.) He indicated that "even though she gets relief from injections, she's not getting a true lasting benefit." (*Id*.)

Several months later, on December 10, 2014, Burgett returned to Dr. Pervez with complaints of night-time panic attacks. (Tr. 661.) On examination, she was "sad looking" and

8

appeared anxious.  (*Id.*)  Dr. Pervez prescribed Cymbalta and Trileptal.  (*Id.*)

Burgett underwent her third back surgery on January 5, 2015.  (Tr. 588-590.)  Operative notes indicate that, during the procedure, Dr. Kiehm discovered calcification of one of Burgett's discs, which was unexpected and complicated the procedure.  (Tr. 589.)  The following month, Burgett reported increasing pain on her right leg, as well as hip tenderness.  (Tr. 649.)  Dr. Kiehm imposed a 20 pound weight restriction for February 2015, and advised her to wear a brace for two weeks.  (*Id.*)

On March 28, 2015, Burgett returned to Dr. Pervez.  (Tr. 663.)  Her panic attacks had stopped, but she was tearful and stressed.  (*Id.*)  On examination, Dr. Pervez noted a sad demeanor, but mental status findings were otherwise normal.  (*Id.*)  He prescribed Cymbalta, Ambien, and Trileptal.  (*Id.*)

On April 5, 2015, Burgett presented to the ER with complaints of right flank pain, lower back pain, and urinary frequency and burning.  (Tr. 603-604.)  Physical examination findings were largely normal, aside from moderate tenderness in her right lower back.  (Tr. 606.)  A CT scan of her abdomen and pelvis did not reveal any acute findings.  (Tr. 607, 629-630.)  Burgett was diagnosed with dysuria and acute back pain and was discharged home in stable condition with prescriptions for Keflex and Percocet.  (Tr. 607.)

On April 7, 2015, Burgett returned to Dr. Kiehm with complaints of right-sided low back pain radiating down her right leg.  (Tr. 650.)  Examination revealed intact sensation, good strength in her lower extremities, positive FABERS, and negative hip maneuvers.  (*Id.*)  Dr. Kiehm recommended a SI joint injection, and prescribed Tramadol, Zipsor, and a Medrol Dose Pak.  (*Id.*)  Two days later, Dr. Wolfe noted back and right SI joint tenderness, positive Patrick-

Faber, and equivocal straight leg raise.  (Tr. 672.)  He administered a right SI joint injection on

April 22, 2015.  (Tr. 673.)

On May 18, 2015, Burgett reported 70% improvement after the SI joint injection.  (Tr.

674.)  On examination, Dr. Wolfe noted her right SI joint was tender but Patrick-FABER was

only mildly positive and straight leg raise testing was negative.  (*Id.*)  Burgett presented to Dr.

Kiehm the following day and again reported significant improvement after her injection. (Tr.

653.)  She stated she was able to sit through a whole movie without having to get up and leave,

and indicated she was "able to do a 3 hour outing at max without having horrible issues whereas

before she could not really leave the house."  (*Id.*)  Dr. Kiehm felt that "overall . . . she is doing

better and her strength is better in her foot."  (*Id.*)

On July 21, 2015, Burgett reported the injection had worn off and she was "quite

miserable."  (Tr. 656.)  Dr. Kiehm noted Burgett was "kind of limping around and in a fair

amount of pain."  (*Id.*)  He indicated that, once her symptoms improved, Burgett would benefit

from a combination of physical therapy and chiropractic treatment.  (*Id.*)

Burgett returned to Dr. Pervez on July 22, 2015.  (Tr. 664.)  She complained of

continuing pain and stiffness, and reported she could do a little cooking but could not carry the

laundry or do the grocery shopping.  (*Id.*)  Burgett's panic attacks had returned, and she reported

experiencing crying spells.  (*Id.*)  Dr. Pervez noted Burgett "was having difficulty in walking and

she was slow to walk around."  (*Id.*)  She had a sad demeanor and constricted affect, but mental

status examination findings were otherwise normal.  (*Id.*)  Dr. Pervez stated: "Echo can't be

working due to physical problems and her depression."  (*Id.*)

On July 30, 2015, Dr. Pervez completed a Medical Source Statement regarding Burgett's

mental functional limitations.  (Tr. 659-660.)  He found Burgett had moderate limitations in her abilities to (1) follow work rules, (2) relate to co-workers, (3) use judgment, (4) interact with supervisors, (5) maintain attention/concentration, (6) understand, remember, and carry out simple job instructions, (7) behave in an emotionally stable manner, (8) relate predictably in social situations, and (9) demonstrate reliability.  (*Id*.)  Dr. Pervez concluded Burgett had marked limitations in her abilities to (1) deal with the public, (2) deal with work stresses, (3) function independently, and (4) understand, remember, and carry out complex and detailed job instructions.  (*Id*.)

Burgett underwent another right SI joint injection on September 17, 2015.  (Tr. 676.) Several weeks later, she presented to Dr. Kiehm and indicated the injection "gave her a little bit of relief and kind of stabilize[d] the pain, but didn't make the pain go away like the first injection."  (*Id*.)  Dr. Kiehm noted Burgett "can only walk around . . . in the grocery [store] for about 10 to 15 minutes, then she has to go sit down."  (*Id*.)  He also stated she had difficulty sitting and standing for long periods of time.  (*Id*.)  Dr. Kiehm indicated Burgett was "still quite miserable and I think she would have difficulty with any kind of work at this time."  (*Id*.)

On October 10, 2015, Burgett returned to Dr. Pervez.  (Tr. 665.)  She was depressed and tearful, and indicated she had been having a difficult time dealing with the pain.  (*Id*.)  Dr. Pervez diagnosed major depressive disorder, recurrent (active), and continued her on her medications.  (*Id*.)

On October 22, 2015, Dr. Wolfe noted Burgett's symptoms had "somewhat worsened" and she was "still struggling a little bit."  (Tr. 677.)  Examination revealed tenderness in her back and right SI joint; borderline Patrick-FABER and straight leg raise; breakaway weakness in her

right; and an abnormal gait.  (*Id*.)  He recommended an epidural block, which Burgett underwent on November 2, 2015.  (Tr. 677, 678.)  Later that month, Dr. Wolfe prescribed physical therapy. (Tr. 679.)

On December 15, 2015, Burgett returned to Dr. Kiehm.  (Tr. 671.)  She stated the injection had helped but complained of continuing back pain radiating down her right leg.  (*Id*.) Dr. Kiehm wrote Burgett off work until she could complete physical therapy "and even maybe some chiropractic treatments and more injections if she needs them."  (*Id*.)

On January 5, 2016, Dr. Wolfe reported Burgett "has made significant progress with therapy."  (Tr. 680.)  He noted "they've gotten her comfortable now in a sedentary position, but she has not gained any further ground."  (*Id*.)  Examination revealed back tenderness and negative straight leg raise.  (*Id*.)

Two months later, on March 8, 2016, Burgett returned to Dr. Kiehm.  (Tr. 860.)  He stated she was going to do another round of physical therapy and noted "it has been over a year since her surgery so in terms of her right leg pain, I am not sure there is another surgery that would directly help the nerve."  (*Id*.)  The following month, Burgett presented to Dr. Pervez with complaints of panic and sleep problems.  (Tr. 761.)  On examination, she was sad looking and anxious.  (*Id*.)

On April 18, 2016, Burgett was "reasonably stable" but tearful.  (Tr. 779.)  Examination revealed back and SI joint tenderness, negative straight leg raise, negative Patrick-Faber, and adequate motor and sensory leg function.  (*Id*.)  Dr. Wolfe changed Burgett's medication.  (*Id*.) The following month, Dr. Wolfe noted "sedentary work is better tolerated and that leads to the possibility that she can pursue a social work education through the Bureau of Vocational

12

Rehab."  (Tr. 777.)  Examination again revealed back and SI joint tenderness and negative

Patrick-Faber.  (*Id.*)

On June 13, 2016, Dr. Wolfe noted it had been more than a year since Burgett's surgery

and "it is time to move this along."  (Tr. 775.)  He stated "we will start work conditioning as

soon as possible and then finish with a [functional capacity evaluation] and then on to a job

search."  (*Id.*)  Several months later, Dr. Wolfe indicated "I have to state that in my professional

opinion, based on my long term relationship with [Burgett] and knowledge off the facility as

well as the injured worker's long term relationship with the therapy department, that she will be

quite capable of doing the minimum [six hours a week] and most likely we can build our way up

to 20 hours a week."  (*Id.*)  He stated "things look as promising as they have been in some time."

(*Id.*)

Burgett began work conditioning on August 17, 2016.  (Tr. 787.)  The record reflects she

was initially "pretty challenged" by the conditioning but began to see some improvement in her

capabilities.  (*Id.*)  On September 26, 2016, Dr. Wolfe noted Burgett was "stable" and her

"activity tolerance is good through the voc rehab work conditioning."  (Tr. 769.)

Burgett underwent a Functional Capacity Evaluation on October 11, 2016.  (Tr. 836-

848.)  She reported completing her work conditioning the previous week and noted she had

progressed to 4 hours per day for 3 days per week, most of which time was spent on her feet.

(Tr. 839.)  With regard to activities of daily living, Burgett indicated she did not require

assistance for basic activities but "has to modify how she does them and sometimes uses

adaptive equipment such as a reacher, a long shoe horn, and a sock aide."  (*Id.*)  She relied on her

children to carry the laundry basket and put clothes in the dryer.  (*Id.*)  During the evaluation,

Christine Cowen, OTR/L, noted Burgett had a slow and slightly antalgic gait and that she "was seated for approximately 50 minutes with minimal shifting in her seat before she had to stand and move around."  (Tr. 841.) Burgett's range of motion was within functional limits, except with respect to her trunk and lateral side bending.  (*Id*.)  She had 4/5 muscle strength in her bilateral hips, right knee, and right ankle.  (Tr. 842.)  Burgett had difficulty balancing on the right more than the left, and she was unable to crawl or reach to floor level.  (Tr. 843, 845, 848.)

> Ms. Cowen summarized her conclusions and observations as follows:
>
> Mrs. Burgett is currently demonstrating material handling abilities  at the sedentary  physical demand classification for lifting at waist  height  and  above and  carrying.  She did not complete any lifting from floor level as she  has limited active range of  motion and reports pain  at 20 degrees of flexion. She uses a reacher at home to  lift very light  items  from  the floor  or asks  one of her children to  help her. Her non-material  handling (positional tasks) were limited in  her  ability to  stand and walk for more than 15  minutes at a time however she stated  that she was  able to be on her feet the majority of the 4 hours at work conditioning. She sat or  leaned  against a wall for support during the evaluation for short periods of  time.  She was unable to complete tasks that  have  trunk flexion  as a  component (static trunk flexion, working at  floor level while kneeling, and  crawling). She did  not attempt repetitive squatting and crouching due to leg and back pain. Pain  behaviors were noted throughout the evaluation such as facial grimacing, slow  movement and rubbing her back. She reported a pain level of 5/10 at the  beginning  of the evaluation and 8/10 in her  right leg, 6/10 in her SI joint  and 7/10 in her low  back at the end of  the evaluation.  Mrs. Burgett was tearful  during  the evaluation  stating that she is frustrated that she cannot do more.

(Tr. 836.)  She recommended Burgett pursue jobs that are rated in the sedentary physical demand classification with the ability to alternate between sitting and standing.  (*Id*.)  In that regard, Ms. Cowen explained that: "Sitting should be for up to an hour at a time with a short period allowed to stand and stretch as needed.  If working in standing or walking, I recommend a short break to sit or lean against a wall for support.  She demonstrated the need for this approximately every 15 minutes during the evaluation however per her report she was able to be on her feet for the

majority of the 4 hour period in work conditioning so it is likely that she could be on her feet for longer periods of time." (*Id*.)  Ms. Cowen further recommended Burgett should avoid squatting, crouching or crawling; and avoid work tasks that required good balance for safety such as climbing or working on uneven surfaces.  (*Id*.)

Burgett returned to Dr. Wolfe on October 13, 2016.  (Tr. 768.)  Based on the results of the FCE, he found she "will need to change positions but overall I would say sedentary or light duty options are within the restrictions." (*Id*.)  He stated he would "go ahead and update her restrictions based on the FCE." (*Id*.)  According to vocational rehabilitation records, Dr. Wolfe imposed "physical restrictions in the light physical demand category specifically no lift over 20 lbs, push/pull over 40 lbs, occasional lift 11-20 lbs, push/pull 26-40 lbs, bend, squat/kneel, twist/turn, climb, sit 4 hours per day with break, walk 4 hours per day with break, stand 4 hours per day with break, constant lift 0-10 lbs, type, work with hot or cold substances."  (Tr. 276.)

Shortly thereafter, on October 16, 2016, Burgett presented to Dr. Pervez.  (Tr. 850.)  She had been having less frequent panic attacks and was more active at home, but "after 4 hours [at work conditioning] she may not be able to do anything with anybody" due to the pain.  (*Id*.)  Burgett indicated she was afraid that "may not be able to do it full time." (*Id*.)  Dr. Pervez noted Burgett had difficulty walking and appeared anxious with a constricted affect.  (*Id*.)

Burgett underwent a comprehensive vocational evaluation on October 24, 2016.  (Tr. 266-282.)  She was friendly and cooperative, but exhibited several pain/discomfort behaviors and took a number of breaks during the evaluation to stand up and stretch.  (Tr. 276-277.)  Burgett indicated she was interested in working part-time to start.  (Tr. 281.)  The vocational counselor recommended a work adjustment program, as well as participation in a structured job

search program.  (Tr. 282.)

On October 25, 2016, Burgett presented to Dr. Wolfe.  (Tr. 857.)  He noted as follows:

Echo is still having a lot of symptoms, in fact, she is tearful at times.  She is stuck in a dilemma of trying to make a decision about whether or not she is going to more actively pursue social security disability and because she has a pending hearing and whether or not I would certify her as incapable of sustaining gainful employment or whether or not she wants to persist with vocational rehabilitation.  Her attorney tells her they are not mutually exclusive, but it requires me to make some kind of statement and I am struggling to figure which direction she really wants to go.  I have been under the  impression that she is capable of gainful employment, including sustained gainful employment, and on that basis we have pursued vocational rehab as well as functional capacities evaluation.  She does have restrictions but based on my assessment, she would be capable of sedentary or light duty work.  Unless that changes, I am reluctant to certify any type of permanent disability.

(Tr. 857.)  On examination, he noted persistent tenderness around the right SI joint with irritated

sciatic nerve on the right, as well as breakaway weakness on Burgett's right side.  (*Id*.)  In

conclusion, Dr. Wolfe stated as follows: "Based on the FCE she should be capable of sedentary

or light duty employment and we are pursuing along those lines.  If she decides to abandon that

to obtain social security disability, then most likely we would end the voc rehab for me to make

that determination."  (*Id*.)

Burgett presented for vocational rehabilitation in October and November 2016.  (Tr. 292-

298, 308-310.)  During the week of October 30, 2016, Burgett worked between 4.0 and 4.25

hours per day, three days per week. (Tr. 292-293.)  She reported significant pain and required

several breaks from sitting and work activities by alternating to a standing position.  (*Id*.)

Burgett was also observed walking with "a very slow and somewhat unsteady gait each day."

(*Id*.)  She used modifications daily, including an adjustable chair, a pillow in her chair for

additional back support, and a box on the floor to place her feet on.  (*Id*.)

16

The following two weeks, Burgett again worked four hours per day, three days per week. (Tr. 294-295, 296-298.)  She reported varying levels of pain each day, and continued to need periodic breaks throughout the workday.  (*Id.*)  Burgett expressed having "significant increases in her physical pain levels when participating in services more than 4 hours per day."  (*Id.*)

On November 17, 2016, Burgett returned to Dr. Pervez with reports of panic attacks.  (Tr. 852-853.)  She stated she "has been doing more than what she can handle." (*Id.*)  Burgett stated she was "hurting at the job" and "can't stand there for [a] long time."  (*Id.*)  Dr. Pervez noted Burgett was "tearful and anxious about the treatment she was getting from Dr. Wolfe."  (*Id.*)  He ordered an EKG and blood work, and continued her on her medications.  (*Id.*)

Burgett returned to Dr. Wolfe on November 23, 2016.  (Tr. 855-856.)  He stated as follows:

> Echo is here for followup.  Once again she is miserable.  I am increasingly of the mind that this persistence at the work/simulation is not accomplishing anything. If anything, she is worse.  It is very aggravating and I have struggled with her to try to figure out what is the best solution.  I know that she had long hoped she could return to the work force with some form of gainful employment, and I was also hopeful of that as well.  However, I have been pondering this now for several months and really struggled with it at the last visit only to see that it is probably increasingly clear in my mind.
>
> * * *
> Based on my observations over the last several months and including since the last visit and listening to the patient's description of not only the process but her symptoms, it is my professional medical opinion that the entire vocational rehab process be put on a medical interrupt and most likely be totally discontinued.  I believe that we should abandon that line of treatment until she stabilizes.  I see no point in persisting.  I think it is fruitless and will not be rewarding in any significant way.
>
> That being said, it makes it much easier for me to realize that even though I had hoped that she might be capable of sedentary or light duty employment, it seems unlikely that she can sustain that.  Based on a strict criteria established by the social security administration, it will then become my professional medical opinion

17

that she is incapable of sustained gainful employment and, therefore, eligible for social security disability based on significant physical limitations.

I would like to talk to her again in two weeks just to make sure we are still on track with that and if we are, then we will go from a medical interrupt to total cessation of voc rehab and she will be at maximum medical improvement and we will strictly provide supportive care from that point forward.

(*Id*.)

On December 8, 2016, Dr. Wolfe completed a Physician's Report of Work Ability for the Ohio Bureau of Workers' Compensation.  (Tr. 862-863.)  He opined Burgett could work for 2 to 4 hours in a day, for a total of 10 to 20 hours per week.  (*Id*.)  Dr. Wolfe concluded that, during an 8 hour workday, Burgett could sit for 4 hours with breaks, walk for 2 hours with breaks, and stand for 1 hour with breaks.  (*Id*.)  Dr. Wolfe further concluded she could occasionally lift and carry 0 to 10 pounds but never more than that; occasionally push/pull 13 to 25 pounds but never more than that; and occasionally type on a keyboard and operate an automatic vehicle.  (*Id*.)  He found Burgett could never bend, squat, kneel, twist/turn, climb, reach above her shoulder level, or operate a standard shift vehicle.  (*Id.*)  Dr. Wolfe also noted Burgett could not safely perform work duties that included operating heavy machinery or driving while taking prescribed medications.  (*Id*.)  He found she had no limitations in her abilities to perform simple grasping or repetitive wrist motion and, further, no impairment in her activities of daily living, social functioning, concentration/persistence/pace, or adaptation abilities.  (*Id*.)

**C.**     **State Agency Reports**

**1.**          **Physical Impairments**

On September 26, 2014, state agency physician James Cacchillo, D.O., reviewed Burgett's medical records and completed a Physical Residual Functional Capacity ("RFC")

Assessment.  (Tr. 81-83.)  Dr. Cacchillo found Burgett could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 30 minutes at a time for a total of 4 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 81.)  He also concluded Burgett could occasionally stoop, kneel, crouch, crawl and climb ramps/stairs; but never climb ladders, ropes, or scaffolds.  (Tr. 81-82.)  Dr. Cacchillo opined Burgett had an unlimited capacity to push/pull and balance, and no manipulative limitations.  (*Id*.)  Lastly, he found Burgett should avoid concentrated exposure to vibration and hazards, noting "no unprotected heights/hazards, vibrational surfaces, [or] commercial driving due to chronic low back pain and [right lower extremity] pain."  (Tr. 82.)

On December 31, 2014, state agency physician Diane Manos, M.D., reviewed Burgett's medical records and completed a Physical RFC Assessment.  (Tr. 102-104.)  Like Dr. Cacchillo, Dr. Manos found Burgett could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 30 minutes at a time for a total of 4 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (Tr. 102.)  She further found Burgett could occasionally stoop, kneel, crouch, crawl, push/pull with her right lower extremity, and climb ramps/stairs; but never climb ladders, ropes, or scaffolds.  (Tr. 102-103.)  Dr. Manos opined Burgett had an unlimited capacity to balance, and no manipulative limitations.  (*Id*.) Lastly, she found Burgett should avoid even moderate exposure to vibration and avoid all exposure to hazards, explaining "limit unprotected heights/hazards, vibrational surfaces, [or] commercial driving due to chronic low back pain and [right lower extremity] pain."  (Tr. 103.)

### 2.        Mental Impairments

On September 26, 2014, state agency psychologist Irma Johnston, Psy.D., completed a

19

Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  (Tr. 79, 83-85.)  In the

PRT, Dr. Johnston found Burgett was mildly restricted in her activities of daily living and had

moderate difficulties in maintaining social functioning and concentration, persistence and pace.

(Tr. 79.)  In the Mental RFC, she found Burgett was moderately limited in her abilities to: (1)

understand, remember, and carry out detailed instructions; (2) maintain attention and

concentration for extended periods; (3) complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; (4) interact appropriately with the general

public; (5) accept instructions and respond appropriately to criticism from supervisors; and (6)

respond appropriately to changes in the work setting.  (Tr. 83-85.)  Dr. Johnston further

explained that Burgett (1) "can understand and recall instructions from one to four steps and

some familiar complex tasks in a low stress setting" without a fast pace; (2) can occasionally and

superficially interact with others in a low stress environment; and (3) can adapt to change in a

low stress setting where changes are well explained, infrequent and gradually introduced.  (*Id*.)

On January 11, 2015, state agency psychologist Carl Tishler, Ph.D., reviewed Burgett's

records and completed a PRT and Mental RFC Assessment.  (Tr. 100, 104-106.)  Dr. Tishler

reached the same conclusions as Dr. Johnston.  (*Id.*)

**D.      Hearing Testimony**

During the December 13, 2016 hearing, Burgett testified to the following:

- She lives in a house with her husband and 18 year old son.  (Tr. 43, 52.)  She graduated from high school, and is taking college classes to get her degree in social work.  (Tr. 43.)  She takes one college class per week, lasting three and one half hours.  (Tr. 44.)  Her professor allows her to stand up, walk around, and take breaks, due to her back pain.  (Tr. 53.)

- She was unable to work between 2004 and 2007 due to a back injury and surgery.  (Tr. 46.) From 2008 to 2013, she worked as a case manager at Goodwill.  (Tr. 44-45.)  In this position, she trained high school students in vocational skills.  (*Id*.)  She lifted up to 50 pounds and was on her feet most of the day.  (*Id*.)

- She is no longer able to work due to her back problems and depression.  She had a second back surgery in 2013, and then a third back surgery in 2015.  (Tr. 48.)  Despite these procedures, she still experiences severe back pain that radiates down her right leg.  (Tr. 49, 55.)  Her pain varies between a 4 and 10, on a scale of 10.  (Tr. 49-50.)  Pain medication helps, but the pain never goes away.  (Tr. 50.)  She was recently prescribed morphine.  (Tr. 56.)  She has also been treated with injections, aqua therapy, and land therapy.  (*Id*.)

- She participated in vocational rehabilitation but was not able to tolerate it.  (Tr. 56-57.)  During rehab, she was able to stand for one hour and sit for one hour.  (*Id*.)  However, she experienced severe pain and was "just miserable."  (*Id*.)  She was not able to work for more than four hours.  (Tr. 57-58.)

- She also suffers from depression.  (Tr. 49.)  It first started in 2004 (after her first back surgery) and then started again in 2013.  (Tr. 49.)  In addition, she experiences panic attacks and anxiety.  (Tr. 59.)  Her panic attacks happen at night, and cause her to wake up screaming.  (*Id*.)  She used to get them every night, but it has been a little better with medication.  (*Id*.)

- Her husband and son do all the household chores.  (Tr. 50.)  Her husband does the cooking and grocery shopping.  (*Id*.)  She does not carry groceries or a laundry basket.  (Tr. 52.)  She drives, but never far distances.  (Tr. 50.)  She sometimes needs assistance getting dressed, and does not bathe every day.  (Tr. 61.)

- She can walk for twenty-five minutes, if she has something to hold on to.  (Tr. 51.)  She cannot stand in one place for more than 10 to 15 minutes.  (Tr. 51-52.)  She can sit for twenty minutes before needing to shift in her seat.  (Tr. 53.)  The longest she can sit before needing to actually stand up is one hour.  (*Id*.)  She cannot lift anything off the ground, but she can lift a gallon of milk from the counter.  (Tr. 52.)

- She is more forgetful than she used to be.  (Tr. 54.)  She sometimes has trouble remembering things from class.  (*Id*.)  She does not feel comfortable in crowds, and has difficulty tolerating other people.  (*Id*.)  When she becomes irritated by other people, she removes herself from the situation.  (*Id*.)  She does not go out with friends.  (Tr. 60.)  She used to go to her son's hockey games, but not his away games.  (*Id*.)

The VE testified Burgett had past work as a vocational training teacher (light but performed as medium, skilled, SVP 7).  (Tr. 61.)  The ALJ then posed the following hypothetical question:

> Now assume a hypothetical individual of the claimant's age and education with the past work that you described.  Further assume that this individual is limited to work at a light exertional level.  I say this with some reservation because I'm limiting this individual to four hours standing and walking in an eight-hour workday, but can only stand and walk for 30 minutes continuously, and must sit 15 minutes before returning to standing and walking.
>
> This individual could lift up to 20 pounds occasionally and 10 pounds frequently.  Pushing and pulling as defined by the ability to lift and carry.  This individual has the following postural limitations. This individual can occasionally climb ramps and stairs, never climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl.  There can be no exposure to workplace hazards such as unprotected heights and moving mechanical parts.  Occasional exposure to vibration.
>
> This individual has the following mental limitations.  This individual is limited to performing simple, routine tasks, with occasional interaction with supervisors, coworkers and the general public.  And this individual must work in a static work environment where change is infrequent.

(Tr. 62.)  The ALJ also noted the individual was limited to sitting for 6 hours in an 8 hour workday.  (Tr. 63.)   The VE testified the hypothetical individual would not be able to perform Burgett's past work as a vocational training teacher, but would be able to perform other representative jobs in the economy, such as assembler (sedentary, unskilled), inspector (sedentary, unskilled), and sorter (sedentary, unskilled).  (*Id.*)

The ALJ then asked a second hypothetical that was the same as the first "except that this individual is limited to standing and walking a total of two hours in an eight-hour workday as opposed to four in the previous hypothetical."  (Tr. 63.)  The VE testified this hypothetical individual could perform the previously identified jobs of assembler, inspector, and sorter.  (Tr.

22

63-64.)

The ALJ then asked whether, under either of the above hypotheticals, any jobs would be available for an individual that would be off task greater than 10% of the time in an eight hour workday, in addition to normal breaks.  (Tr. 64.)  The VE testified there would be no jobs for such an individual.  (*Id*.)  The ALJ next asked whether any jobs would be available for an individual that is absent from work two days per month.  (*Id*.)  The VE again testified there would be no jobs for such an individual.  (*Id*.)

The ALJ then asked the following questions:

> Q:    For the next hypothetical, hypothetical five, I'm going to go back to the second  hypothetical where I'm limiting the individual to two hours of standing and walking.  I'm going to change the postural limitations.  If I said that this individual could not perform any postural maneuvers, so there'd be no climbing of ramps and stairs, no climbing of ladders, ropes or scaffolds, no stooping, kneeling, crouching or crawling, and no balancing of the type that is described in the Dictionary of Occupational Titles, that would be the dangerous type of balancing as described in the Dictionary of Occupational Titles. So if we have no postural maneuvers with the limitations in the second hypothetical, would there still be other work?

> A:    Well, those jobs I identified at sedentary would still apply, because those are not significant factors in sedentary work.

> Q:    What about with the no stooping, this individual could never stoop?

> A:    Well, [INAUDIBLE] Selected Characteristics, stooping is not a factor in those jobs.  I mean, there is sitting, of course. You're primarily working at a desk-type.

(Tr. 65.)

Finally, Burgett's counsel asked the following hypothetical question:

> If we were to consider again, I believe it would be [the ALJ's] first hypothetical, and if we were to assume that the hypothetical individual, in addition to the limitations that the Judge imposed, that the individual would need a special chair in order to sit, that would need to be able to use pillows for back support, that would need a foot rest because of an impaired leg, would require what is known

23

as a Varidesk at the workstation, and would need to be permitted to take four breaks ranging from five to ten minutes in addition to the normal morning and afternoon 15-minute breaks, so we're looking at six breaks throughout the day, and during those breaks the individual would not be working but would be bending, stretching and trying to recover some level of comfort.  If we were to place those restrictions there, also, is the individual still capable of working in a competitive way?

(Tr. 66.)  The VE testified such a limitation would require an accommodation and, therefore, there would be no competitive work available for such an individual.  (Tr. 66-67.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe

24

impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Burgett was insured on her alleged disability onset date, October 28, 2013, and remains insured through June 30, 2019, her date last insured ("DLI.")  (Tr. 19.)  Therefore, in order to be entitled to POD and DIB, Burgett must establish a continuous twelve month period of disability commencing between these dates.  Any discontinuity in the twelve month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2019.  (Exhibit 10D).

2.    The claimant has not engaged in substantial gainful activity since October 28, 2013, the alleged onset date (20 CFR 404.1571 et seq.) (Hearing Testimony, and Exhibits 2D-10D, 3E, 4E, 6E, 11E, and 3F.)

3.      The claimant has the following severe impairments: Degenerative disc disease of the lumbar spine status post discectomy, fusion, and laminectomy; and depression (20 CFR 404.1520(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in  20 CFR  404.1567(a) and meaning that the claimant can lift and carry 10 pounds occasionally and less than 10 pounds frequently with the ability to push/pull as much as can lift/carry; can sit for 6 hours and stand or walk for 2 hours in an 8-hour workday, and can stand or walk for 30 minutes continuously, then must sit for 15 minutes before returning to standing or walking; can climb ramps and stairs occasionally,  but  never climb ladders, ropes, or scaffolds; can  balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally; cannot have exposure to workplace hazards, such as unprotected heights or moving mechanical parts, but can have exposure to vibration occasionally;   can perform simple, routine tasks, can have occasional interaction with supervisors, coworkers, and the general public; and must work in a static work environment where change is infrequent.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565) (Hearing Testimony, and Exhibits 2D-10D, 3E, 4E, 6E, 11E, and 14E.)

7.      The claimant was born on February **, 1970 and was 43 years old, which is defined as a younger individual age 18-44, on the  alleged disability onset date.   The claimant subsequently changed age category to a younger individual age 45-49 (20 CFR  404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR  404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the  Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable  job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR  404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from October 28, 2013, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 19-30.)

# V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir.

27

2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D.

Ohio July 9, 2010).

## VI. ANALYSIS

***Treating Physician Dr. Wolfe***

In her first assignment of error, Burgett argues the ALJ failed to properly evaluate the opinion of her treating physician, Dr. Wolfe. (Doc. No. 12 at 5-9.) She maintains the ALJ "erroneously made assumptions regarding Dr. Wolfe's ability to evaluate Ms. Burgett's conditions and disregarded the consistent evidence of the record that supports Dr. Wolfe's opinion," including his own treatment notes, the objective medical evidence, the October 2016 FCE, and Dr. Kiehm's treatment notes. (*Id*.) Burgett also argues the ALJ cherry picked the record and "played doctor" in concluding Dr. Wolfe's opinion was based entirely on his desire to "provide opinions based on what [Burgett] wants to do with her life rather than what she is physically and mentally capable of doing." (*Id*.) Finally, Burgett argues the "ALJ's analysis fails to be meaningful and sufficiently specific enough for subsequent reviewers to understand his reasoning or to satisfy the ALJ's duty to provide a meaningful analysis of the weight accorded to the medical opinions of the record." (*Id*.)

The Commissioner argues the ALJ properly considered Dr. Wolfe's opinions and articulated good reasons for giving them little weight. (Doc. No. 13 at 11-16.) First, she maintains the ALJ properly discounted Dr. Wolfe's December 2016 opinion because it was a "checklist opinion" that failed to provide any explanation for the basis of his assessed limitations. (*Id*.) The Commissioner then argues the ALJ articulated several good reasons for discounting his opinions, including that they were (1) inconsistent with the record as a whole and (2) appeared to be based on Burgett's "sudden increase in subjective complaints just prior to her

29

social security hearing." (*Id.*) In sum, the Commissioner asserts that "while Plaintiff disagrees

with the weight given to the medical opinions, she has established no error in the ALJ's analysis

that would warrant remand for further consideration." (*Id.*)

A treating source opinion must be given "controlling weight" if such opinion (1) "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2)

"is not inconsistent with the other substantial evidence in [the] case record." *Gayheart v.*

*Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).[3] However,

"a finding that a treating source medical opinion . . . is inconsistent with the other substantial

evidence in the case record means only that the opinion is not entitled to 'controlling weight,'

not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir.

2009) (quoting SSR 96-2p, 1996 WL 374188 at *4 (SSA July 2, 1996)).[4] Indeed, "[t]reating

source medical opinions are still entitled to deference and must be weighed using all of the

factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[5] *See also*

*Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion

controlling weight, then the opinion is weighed based on the length, frequency, nature, and

---

[3] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[4] SSR 96-2p has been rescinded. This rescission is effective for claims filed on or after March 27, 2017. *See* SSR 96-2p, 2017 WL 3928298 at *1.

[5] Pursuant to 20 C.F.R. § 404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

extent of the treatment relationship, *id.,* as well as the treating source's area of specialty and the

degree to which the opinion is consistent with the record as a whole and is supported by relevant

evidence, *id*. § 404.1527(c)(2)-(6)."

If the ALJ determines a treating source opinion is not entitled to controlling weight,

"the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486

F.3d 234, 242 (6th Cir. 2007) (quoting SSR 96-2p, 1996 WL 374188 at *5).  *See also Gayheart*,

710 F.3d at 376.  The purpose of this requirement is two-fold.  First, a sufficiently clear

explanation "'let[s] claimants understand the disposition of their cases,' particularly where a

claimant knows that his physician has deemed him disabled and therefore 'might be bewildered

when told by an administrative bureaucracy that she is not, unless some reason for the agency's

decision is supplied.'"  *Id.* (quoting *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir.

2004)).  Second, the explanation "ensures that the ALJ applies the treating physician rule and

permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at

544.  Because of the significance of this requirement, the Sixth Circuit has held that the failure to

articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of

substantial evidence, even where the conclusion of the ALJ may be justified based upon the

record."  *Rogers*, 486 F.3d at 243.

Nevertheless, the opinion of a treating physician must be based on sufficient medical

data, and upon detailed clinical and diagnostic test evidence.  *See Harris v. Heckler*, 756 F.2d

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406.  The ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them.  *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs*., 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984).  According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability.  This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled.  "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."  *Id*.  It is the Commissioner who must make the final decision on the ultimate issue of disability.  *Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

Here, Dr. Wolfe authored two opinions regarding Burgett's physical functional limitations.  The first is a treatment note dated November 23, 2016, in which Dr. Wolfe indicated as follows: "even though I had hoped that [Burgett] might be capable of sedentary or light duty employment, it seems unlikely that she can sustain that.  Based on a strict criteria established by the social security administration, it will then become my professional medical opinion that she is incapable of sustained gainful employment and, therefore, eligible for social security disability based on significant physical limitations."  (Tr. 855.)

Several weeks later, on December 8, 2016, Dr. Wolfe completed a Physician's Report of Work Ability for the Ohio Bureau of Workers' Compensation.  (Tr. 862-863.)  As noted *supra*, in that opinion, Dr. Wolfe opined Burgett could work for 2 to 4 hours in a day, for a total

32

of 10 to 20 hours per week.  (*Id.*)  Dr. Wolfe concluded that, during an 8 hour workday, Burgett

could sit for 4 hours with breaks, walk for 2 hours with breaks, and stand for 1 hour with breaks.

(*Id.*)  Dr. Wolfe further found she could occasionally lift and carry 0 to 10 pounds; occasionally

push/pull 13 to 25 pounds; and occasionally type on a keyboard and operate an automatic

vehicle.  (*Id.*)  He found Burgett could never bend, squat, kneel, twist/turn, climb, reach above

her shoulder level, or operate a standard shift vehicle.  (*Id.*)  Finally, Dr. Wolfe noted Burgett

could not safely perform work duties that included operating heavy machinery or driving while

taking prescribed medications.  (*Id.*)

The ALJ accorded Dr. Wolfe's opinions "little weight," as follows:

> The undersigned assigns little weight to the treating physician's opinion, as it does
> not merit controlling weight (James Wolfe, M.D., 11/23/2016, Exhibit 25F/2, and
> 12/8/2016, Exhibit 27F). Dr. Wolfe is an acceptable  medical source who is also a
> treating source.  However, he opined  that all vocational rehabilitation should be
> stopped and she should be considered as being disabled since she cannot sustain
> employment.  The opinion of whether a person is disabled or not is reserved for the
> Commissioner. Also, stopping vocational rehabilitation based on the claimant's
> subjective symptoms at the end of 2016 is contrary to her own pursuit of continuing
> to attend classes on a fall-time basis to obtain a bachelor's degree.  Later, he opined
> that she has no mental limitations, which is not consistent with the rest of the record.
> Also, the standing,  walking, and sitting limitations in his opinion do not add up to
> an 8-hour workday unless he was also opining that the claimant needs 1 hour of
> breaks.   Additionally,  the  many  other  physical  limitations,  such  as  occasional
> typing/keyboarding, appear to be due to the claimant's sudden increase in reporting
> of subjective symptoms just prior to the hearing.  Possibly the only information that
> helps explain the problems with his opinions is that he admitted in his own notes that
> he has been trying to provide opinions based on what she wants to do with her life
> rather than what she is physically and mentally capable of doing.  He indicated that
> "she is stuck in a dilemma of trying to make a decision" and that "I am struggling to
> figure which direction she really wants to go.  I have been under the impression that
> she is capable of gainful employment, including sustained gainful employment, and
> on that basis we have pursued vocational rehab as well as functional capacities
> evaluation.  She does have restrictions but based on my assessment, she would be
> capable of sedentary or light duty work.  Unless that changes, I am reluctant to
> certify any type of permanent disability" (Exhibits 20F/2, and 25F/4).

(Tr. 27-28.)   The ALJ assessed the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR  404.1567(a) and meaning that the claimant can lift and carry 10 pounds occasionally and less than 10 pounds frequently with the ability to push/pull as much as can lift/carry; can sit for 6 hours and stand or walk for 2 hours in an 8-hour workday, and can stand or walk for 30 minutes continuously, then must sit for 15 minutes before returning to standing or walking; can climb ramps and stairs occasionally,  but  never climb ladders, ropes, or scaffolds; can  balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, and crawl occasionally; cannot have exposure to workplace hazards, such as unprotected heights or moving mechanical parts, but can have exposure to vibration occasionally; can perform simple, routine tasks, can have occasional interaction with supervisors, coworkers, and the general public; and must work in a static work environment where change is infrequent.

(Tr. 24.)

As an initial matter, the Court notes it is undisputed Dr. Wolfe constituted Burgett's treating physician at the time he authored his November 2016 and December 2016 opinions. Indeed, the record reflects Burgett began treatment with Dr. Wolfe in June 2013 and presented to him on over twenty (20) occasions during the relevant time period.  (Tr. 539, 540, 541, 403, 511-514, 672-680, 768-777, 855-857.)  It is further undisputed that the ALJ rejected many of the specific limitations set forth in Dr. Wolfe's December 2016 opinion, including his opinions that Burgett could (1) work for only 2 to 4 hours in a day, for a total of 10 to 20 hours per week; (2) sit for 4 hours with breaks; and (3) never bend, squat, kneel, twist/turn, or reach above her shoulder level.  (*Id.*)  Thus, the ALJ was required to consider whether to accord "controlling weight" to Dr. Wolfe's opinion and, if not, to articulate "good reasons" for discounting his opinions.

The Court first finds the ALJ properly rejected Dr. Wolfe's November 23, 2016 opinion that Burgett "is incapable of sustained gainful employment and, therefore, eligible for social

34

security disability based on significant physical limitations." (Tr. 855.) As noted above, an ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled. *See King*, 742 F.2d at 973; *Duncan*, 801 F.2d at 855; *Garner*, 745 F.2d at 391. *See also* 20 C.F.R. § 404.1527(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled.") Rather, it is well-established that it is the Commissioner (and not a treating physician) who must make the final decision on the ultimate issue of disability. *See Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435. Thus, the ALJ did not err in rejecting Dr. Wolfe's broad conclusion that Burgett was "disabled" under social security regulations.

However, for the following reasons, the Court finds the ALJ failed to articulate "good reasons" for rejecting the more specific proposed limitations set forth in Dr. Wolfe's December 2016 opinion. The first reason provided by the ALJ for discounting Dr. Wolfe's opinion is that "stopping vocational rehabilitation based on the claimant's subjective symptoms at the end of 2016 is contrary to her own pursuit of continuing to attend classes on a fall-time basis to obtain a bachelor's degree." (Tr. 27.) The record reflects Burgett's vocational rehabilitation in October and November 2016 consisted of working 4 hours per day for 3 days per week, for a total of 12 hours per week. (Tr. 292-298.) Burgett's college class, however, involved a significantly lower time commitment. Specifically, Burgett testified at the hearing that she takes one, 3 ½ hour college class per week. (Tr. 44.) She further testified that her professor allows her to stand up, walk around, and take breaks whenever she needs to during class, due to her back pain. (Tr. 53.) Given the disparity in hours between Burgett's college class and her vocational rehabilitation schedule, the Court finds the ALJ's first basis for discounting Dr. Wolfe's opinion does not

35

constitute a "good reason" for purposes of social security regulations.  The ALJ failed to

adequately explain how Burgett's ability to attend one, 3 ½  hour college class per week (with

accommodations) is inconsistent with Dr. Wolfe's opinion that she could not tolerate working 12

hours per week as part of vocational rehabilitation.

The second reason provided by the ALJ for discounting Dr. Wolfe's opinion is as

follows: "the standing, walking, and sitting limitations in his opinion do not add up to an 8-hour

workday unless he was also opining that the claimant needs 1 hour of breaks." (Tr. 27.)  It is not

clear to this Court, however, why Dr. Wolfe's opinion of Burgett's sitting, standing, and walking

limitations are required to "add up" to an 8 hour workday.  The Commissioner cites no case law

or regulatory requirement to that effect and it is not obvious to this Court why a treating

physician's opinion of standing, walking and sitting limitations should be required to satisfy an 8

hour threshold.  Indeed, treating physicians often opine that a patient is not, in fact, capable of

sitting, standing, and walking for the entirety of an 8 hour workday.  Accordingly, and in the

absence of any citation to legal authority to the contrary, the Court finds this basis for

discounting Dr. Wolfe's opinion is not a "good reason" for purposes of social security

regulations.

The third reason provided by the ALJ for discounting Dr. Wolfe's opinion is that "the

many other physical limitations, such as occasional typing/keyboarding, appear to be due to the

claimant's sudden increase in reporting of subjective symptoms just prior to the hearing." (Tr.

27-28.)  The ALJ explained that "[p]ossibly the only information that helps explain the problems

with his opinions is that he admitted in his own notes that he has been trying to provide opinions

based on what she wants to do with her life rather than what she is physically and mentally

capable of doing." (Tr. 28.)  In reaching this conclusion, the ALJ cited Dr. Wolfe's treatment note dated October 25, 2016.  (Tr. 857.)  In that note (which was written prior to Burgett's attempt at vocational rehabilitation), Dr. Wolfe stated as follows:

> Echo is still having a lot of symptoms, in fact, she is tearful at times.  She is stuck in a dilemma of trying to make a decision about whether or not she is going to more actively pursue social security disability and because she has a pending hearing and whether or not I would certify her as incapable of sustaining gainful employment or whether or not she wants to persist with vocational rehabilitation.  Her attorney tells her they are not mutually exclusive, but it requires me to make some kind of statement and I am struggling to figure which direction she really wants to go.  I have been under the  impression that she is capable of gainful employment, including sustained gainful employment, and on that basis we have pursued vocational rehab as well as functional capacities evaluation.  She does have restrictions but based on my assessment, she would be capable of sedentary or light duty work.  Unless that changes, I am reluctant to certify any type of permanent disability.

(Tr. 857.)  Based on this treatment note, the ALJ concluded Dr. Wolfe's subsequent opinion that Burgett was not capable of sedentary work, was principally motivated by a desire to accommodate Burgett's wishes rather than an accurate reflection of her actual physical functional limitations.

For the following reasons, the Court finds that, under the circumstances presented, the rationale articulated by the ALJ does not constitute a "good reason" for rejecting the proposed physical limitations set forth in Dr. Wolfe's December 2016 opinion.  While the ALJ's interpretation of Dr. Wolfe's October 25, 2016 treatment note, standing alone, is not inherently unreasonable, a careful review of the decision reveals the ALJ evaluated this particular treatment note in isolation, failing to properly consider it in the context of Dr. Wolfe's lengthy treatment history with Burgett both before and after that particular visit.  Indeed, the ALJ appears to have rejected Dr. Wolfe's December 2016 opinion for the entire period of alleged disability (i.e., from Burgett's alleged onset date of October 2013 through the date of the decision, February 2017)

based almost entirely on the content of Dr. Wolfe's October 25, 2016 note.  This is problematic
for several reasons, as discussed below.

       As an initial matter, the ALJ did not evaluate, at any point in the decision, the
supportability of Dr. Wolfe's proposed physical functional limitations for the time period
between her October 2013 alleged onset date and her January 2015 back surgery.  This is
concerning as there is evidence in the record that is arguably consistent with Dr. Wolfe's opinion
with respect to this particular time period.  As discussed *supra*, the record reflects Burgett
complained of severe back pain with radicular symptoms throughout the fourteen (14) month
period between her second and third back surgeries; i.e., between October 28, 2013 and January
5, 2015.  An MRI of Burgett's lumbar spine dated June 2014 showed broad-based disc
protrusion at L5-S1 with foraminal narrowing, as well as disc bulging at L4-L5 with facet
arthropathy and abutment of the L5 nerve root.  (Tr. 557.)  Moreover, the record contains
numerous abnormal clinical examination findings during this time period, including tenderness
to palpation, positive straight leg raise, right-sided weakness, reduced lower extremity strength,
diminished sensation, and antalgic gait.  (Tr. 540, 541, 523-524, 409-410, 512.)  Conservative
treatment failed to alleviate Burgett's pain, requiring Burgett's third back surgery in January
2015.  Notably, the ALJ failed to discuss any of the abnormal physical examination findings
noted above at any point in the decision.  Nor did he sufficiently articulate how Dr. Wolfe's
opinion of significant physical functional limitations was inconsistent with this evidence.

       The ALJ does correctly note that, after her January 2015 back surgery, Burgett
eventually showed some improvement after extensive treatment, including physical therapy,
injections, and pain medication.  Throughout, Burgett expressed the hope that she would be able

to return to gainful employment.  To that end, and in light of indications of improvement, Dr.

Wolfe authorized work conditioning in August 2016, following by a FCE in October 2016.

Based on the results of the FCE, Dr. Wolfe's October 25, 2016 treatment note authorized

vocational rehabilitation with sedentary/light work restrictions.  (Tr. 857.)

        The ALJ acknowledged evidence that Dr. Wolfe cleared Burgett for vocational rehab,

but then failed to acknowledge or meaningfully discuss subsequent evidence in the record.  After

her October 25, 2016 visit with Dr. Wolfe, Burgett attempted to work 12 hours per week in a

vocational rehabilitation setting.  Records from her vocational counselor reflect Burgett

demonstrated significant difficulty with the physical demands of this work.  She reported

"significant pain and not feeling well upon arrival each day and throughout each shift worked."

(Tr. 293, 297, 309-310.)  Vocational notes indicate Burgett required frequent breaks during her

four hour shift, in addition to standard 15 minute breaks.  (*Id*.)  She was also observed walking

with a slow and usteady gait, and demonstrated pain behaviors on many occasions throughout

her shift despite the many accommodations provided.  (*Id*.)  Contemporaneous treatment records

document her complaints of increased pain.  (Tr. 852.)  For example, on November 17, 2016,

Burgett presented to Dr. Pervez for follow-up.  (*Id*.)  She was tearful and noted she was "hurting

at the job," "can't stand there for a long time," and "has been doing more than what she can

handle." (*Id.*)  The ALJ does not address or acknowledge this evidence in the context of

evaluating Dr. Wolfe's opinion.

        Burgett returned to Dr. Wolfe on November 23, 2016.  (Tr. 855-856.)  Dr. Wolfe's

treatment note from that date contains a lengthy discussion of his thought process regarding

Burgett's condition, none of which is discussed (or even acknowledged) in the ALJ's decision.

Specifically, Dr. Wolfe observed that Burgett was "miserable," described her condition as "worse," and concluded "this persistence at the work/simulation is not accomplishing anything." (Tr. 855.)  Dr. Wolfe expressed that, while he had been hopeful that Burgett could return to the work force, it had become clear to him that she could not based on her response to vocational rehab.  (*Id.*)  He then explained as follows:

> **Based on my observations over the last several months and including since the last visit** and listening to the patient's description of not only the process but her symptoms, it is my professional medical opinion that the entire vocational rehab process be put on a medical interrupt and most likely be totally discontinued.  I believe that we should abandon that line of treatment until she stabilizes.  I see no point in persisting.  I think it is fruitless and will not be rewarding in any significant way.
>
> That being said, it makes it much easier for me to realize that even though I had hoped that she might be capable of sedentary or light duty employment, it seems unlikely that she can sustain that.  Based on a strict criteria established by the social security administration, it will then become my professional medical opinion that she is incapable of sustained gainful employment and, therefore, eligible for social security disability based on significant physical limitations.

(*Id.*) (emphasis added).

The ALJ failed to acknowledge or meaningfully discuss the above treatment note at any point in the decision.  Rather, the ALJ summarily concluded that "possibly the only information that helps explain" Dr. Wolfe's December 2016 opinion is that it was an accommodation, i.e., that his opinion was motivated solely by a desire to "try[] to provide opinions based on what [Burgett] wants to do with her life rather than what she is physically and mentally capable of doing."  (Tr. 28.)  Under the circumstances, the Court finds the ALJ's observation in this regard amounts to speculation, which is inapposite of the procedural "good reason" requirement mandated by agency rules and regulations.  The Sixth Circuit Court of Appeals has rejected similar language in ALJ decisions.  *See e.g., Blakley*, 581 F.3d at 408 (holding the ALJ's

unexplained conclusion that a treating physician provided an opinion due to sympathy with his patient and/or "in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension" did not comport with the good reasons requirement.)  Districts courts too have repeatedly chastised ALJs for using similar reasoning.  *See e.g., Wilson v. Berryhill,* 2017 WL 2790186 at * 5 (E.D. Tenn. June 27, 2017) (remanding where ALJ failed to provide good reasons for discounting a treating physician decision and finding "the ALJ's observation that Dr. Laman's opinions may have been the result of sympathy for the Plaintiff or an attempt to avoid unnecessary tension in the treating relationship" to be "troublesome");"*Antes v. Comm'r of Soc. Sec.*, 2014 WL 1366465 at *3 (W.D. Mich. Mar. 31, 2014) ("Such speculative reasoning cannot be construed to constitute the required 'good reasons,' or substantial evidence, for rejecting Dr. Simmons' opinions.")[6]  The Court finds that is particularly the case here, where the ALJ failed to acknowledge or address the fact that Dr. Wolfe expressly explained that his change of heart regarding Burgett's ability to perform sedentary work was based in part on his own "observations over the last several months and including since the [October 25, 2016] visit." (Tr. 855.)

The Commissioner nonetheless argues remand is not required because Dr. Wolfe's opinion is an unsupported "checklist opinion," internally inconsistent in several respects, and inconsistent with the record as a whole.  (Doc. No. 13 at 13-15.)  The Commissioner, however,

---

[6] *See also Paulos v. Comm'r of Soc. Sec.*, 2013 WL 4507922, at *5 (E.D. Mich. Aug. 23, 2013) ("This asserted reason for rejecting Dr. Engelmann's opinion is no reason at all and it is certainly not a 'good reason.'"); *Henry v. Astrue*, 2011 WL 676928, at *6 (E.D. Ky. Feb. 16, 2011) ("Essentially, the ALJ is simply making a conclusory statement that the limitation of the plaintiff ... is not supported by objective findings and that, based on no more than supposition, the opinion might have been given as an attempt to accommodate the plaintiff.")

cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration."  *See, e.g., Blackburn v. Colvin*, 2013 WL 3967282 at * 8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, 2013 WL 3791439 at * 6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, 2012 WL 253320 at * 5 (N.D. Ohio Jan. 26, 2012). Here, the various arguments now advanced by the Commissioner were not articulated by the ALJ as reasons for rejecting Dr. Wolfe's December 2016 opinion.  Accordingly, this Court rejects the Commissioner's *post hoc* rationalizations.

In sum, the Court finds the ALJ failed to set forth good reasons for rejecting the limitations assessed by Dr. Wolfe in his December 2016 opinion.  Accordingly, the Court recommends a remand is necessary, thereby affording the ALJ the opportunity to properly address the physical functional limitations assessed by Dr. Wolfe therein, in the context of the record as a whole.

### RFC and the Weighing of the Medical Evidence

In her second assignment of error, Burgett argues the RFC is not supported by substantial evidence because it fails to adequately account for her physical impairments.  (Doc. No. 12 at 11-14.)  She asserts the ALJ erred because he accorded no significant weight to any medical opinion of record.  (*Id.*)  Moreover, Burgett maintains the ALJ purported to give the state agency physician opinions only "partial weight" because they were not sufficiently restrictive but then failed to include any additional limitations in the RFC.  (*Id.*)  She argues "the only conclusion that subsequent reviewers can assume is that the ALJ used his lay opinion to

make a determination regarding the work limitations that should be associated with Ms.

Burgett's physical impairments." (*Id*.)

The Commissioner argues an ALJ's RFC finding need not correspond to any one

physician's opinion. (Doc. No. 13 at 17.)  Rather, she maintains the Commissioner has the final

authority to make a determination of disability, including the determination of a claimant's RFC.

(*Id*.)  Burgett argues that "while the ALJ's RFC did not mirror any one physician's opinion, the

ALJ did not 'play doctor' as Plaintiff suggests." (*Id*. at 18.)  Lastly, the Commissioner asserts

the ALJ's RFC is supported by substantial evidence in the record, including the FCE report.  (*Id*.

at 17.)

The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[7]  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774

---

[7] This regulation has been superseded for claims filed on or after March 27, 2017.  As
Burgett's application was filed in July 2014, this Court applies the rules and regulations
in effect at that time.

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p at *7, 1996 WL 374184(SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

As the undersigned has recommended this matter be remanded for further consideration of Dr. Wolfe's December 2016 opinion, it is possible the ALJ's RFC determination may change on remand. Thus, and in the interests of judicial efficiency, the Court will not address the parties' arguments regarding the alleged deficiencies in the ALJ's discussion of the medical evidence at step four.[8]

---

[8] The Court does note, however, that it disagrees with Burgett's argument that the RFC does not contain more significant limitations than that set forth in the state agency physicians' opinions, both of which were issued prior to Burgett's January 2015 back surgery. As Burgett notes, the ALJ accorded only "partial weight" to the opinions of Drs. Cacchillo and Manos, reasoning "the entire record supports that the claimant is more limited in terms of lifting, carrying, walking, and standing, and needs a limitation in regards to workplace hazards." (Tr. 26.) Burgett complains that, while the ALJ indicated greater restrictions were warranted, the RFC is not, in fact, significantly more restrictive than Drs. Cacchillo and Manos' opinions. The Court disagrees. While Drs. Cacchillo and Manos opined Burgett could lift and carry 20 pounds occasionally and stand/walk for a total of 4 hours in a workday, the ALJ determined Burgett could lift no more than 10 pounds occasionally and stand/walk for no more than 2 hours in an workday. *Compare* Tr. 24, 81, 102. The ALJ's RFC also imposed the additional limitation that Burgett can stand/walk for 30 minutes continuously but then must sit for 15 minutes before returning to standing or walking. (Tr. 24.) Thus, the Court rejects Burgett's argument that the RFC

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further consideration consistent with this decision.

                                        _s/Jonathan D. Greenberg_____
                                        Jonathan D. Greenberg
                                        United States Magistrate Judge

Date: December 20, 2018

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

---

is unsupported by substantial evidence because it fails to reflect the ALJ's conclusion
that greater restrictions than those imposed by Drs. Cacchillo and Manos were warranted.

45